UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| FIRST FRANKLIN FINANCIAL | ) |
| CORPORATION, | ) |
| | ) |
| Plaintiff(s), | ) |
| | ) |
| vs. | ) Case No. 4:07CV1478 JCH |
| | ) |
| RESIDENTIAL TITLE SERVICES, INC., | ) |
| | ) |
| Defendant(s). | ) |

# MEMORANDUM AND ORDER

This matter is before the Court on Residential Title Services, Inc.'s ("RTS") Motion for Summary Judgment, filed April 9, 2009. (Doc. No. 45). The matter is fully briefed and ready for disposition.

# BACKGROUND

On April 7, 2005, borrower Christopher Morgan ("Morgan") granted to Advantage Mortgage Consulting, Inc. ("Advantage") the exclusive right to negotiate a refinancing mortgage loan commitment on the subject property, located at 332 N. Van Brunt, Kansas City, Missouri, 64123 ("subject property"). (RTS's Statement of Uncontroverted Material Facts ("RTS's Facts"), ¶ 8, citing Loan Brokerage Agreement, attached to First Franklin Financial Corporation's First Amended Complaint ("Complaint" or "Compl.") as Exh. 1). The Rider to the Loan Brokerage Agreement itemized the services Advantage would render for Morgan, and the services it would render for the lender.[1] (Id., ¶ 9, citing Rider, attached to Compl. as Exh. 2). Specifically, as relevant here the Rider provided as follows:

---

[1] The "Lender," left to be determined at the time the Rider was executed, ultimately proved to be First Franklin. (Compl., ¶ 8, citing Exh. 2, Article B).

> A. *Services Rendered for Applicant [Morgan] and Lender.*
> The following is a summary of the services that Broker [Advantage] will perform to assist Applicant and Lender in completing this loan:....
> 3. Determining the appropriate mortgage amount and payment for Applicant's budget and needs, based on available credit terms, closing costs and escrow payments, if any.
> 4. Assisting Applicant in completing the mortgage loan application....
> 9. Assisting Applicant in the closing and with regard to future servicing questions.
>
> B. *Services Rendered for Lender.*
> 1. Collecting financial information from Applicant and others for submission to Lender in a form acceptable to Lender.
> 2. Assisting Lender in determining the appropriate mortgage amount and payment for Applicant's budget and needs, based on available credit terms, closing costs and escrow payments, if any.

(Rider, Compl., Exh. 2).

On or about April 14, 2005, Advantage entered into a Level 1 Correspondent Loan Purchase Agreement (the "Agreement") with First Franklin Financial Corporation ("First Franklin"). (RTS's Facts, ¶ 11, citing Agreement, attached to Compl. as Exh. 3). Through the Agreement, Advantage agreed to sell to First Franklin promissory notes, secured by mortgages or deeds of trust, on residential real property which met the criteria of First Franklin's mortgage purchase programs. (Compl., ¶ 9). The Agreement provided that Advantage warranted the terms of each loan, and that all loan documents would be complete and accurate, would not omit to state material facts, and would comply with all applicable laws. (Id., ¶ 10, citing Agreement, Article II § 2.02 A-G). Advantage further warranted that, "[n]o error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Loan has taken place on the part of [Advantage], the Borrower or any other party involved in the solicitation, origination or closing of the Loan or in the application of any insurance in relation to such Loan or in connection with the sale of such Loan to First Franklin." (Id., ¶ 11, quoting Agreement, Article II § 2.02(O)). The Agreement further required Advantage to repurchase loans sold to First Franklin under certain circumstances, and to indemnify

First Franklin for damages under certain circumstances. (Id., ¶¶ 12, 13, citing Agreement, Article V §§ 5.01, 3.02).

Advantage represented the Morgans, the borrowers of funds from First Franklin, in the refinancing of the subject property. (RTS's Facts, ¶ 13, citing Loan Brokerage Agreement and Rider). Toward that end, the Morgans provided information to Advantage employees, and Advantage assisted the Morgans in completing a Uniform Residential Loan Application for submission to First Franklin. (Id., ¶ 14, citing Uniform Residential Loan Application, attached to Compl. as Exh. 4; Compl., ¶¶ 16, 17).[2] Advantage then determined the appropriate mortgage amount and payment based on the Morgans' income, available credit terms, closing costs and escrow payments. (RTS's Facts, ¶ 15, citing Compl., ¶ 19).

RTS acted as settlement agent for the Morgan closing. (RTS's Facts, ¶ 16). During the relevant time period, RTS employed Julie A. Brown ("Brown") as a Vice President and Branch Manager. (Id., ¶ 26 (citation omitted); Plaintiff First Franklin's Statement of Uncontroverted Material Facts, ¶ 15 (citation omitted)). Advantage issued Special Closing Instructions to RTS prior to the closing.[3] (RTS's Facts, ¶ 17, citing RTS's Exh. 6, Special Closing Instructions). RTS did not represent the Morgans in the refinancing of the subject property. (RTS's Facts, ¶ 18 (citation

---

[2] While First Franklin acknowledges Advantage completed loan documentation for the Morgans, it maintains Morgan and Judy Ann Morgan did not understand the terms contained therein. (First Franklin's Response to RTS's Facts, ¶ 14). First Franklin further maintains the documents and terms presented to the Morgans were different from those ultimately submitted to First Franklin. (Id.).

[3] Although First Franklin now maintains the Special Closing Instructions were provided to Advantage by First Franklin for use in the closing of all First Franklin loans, see First Franklin's Response to RTS's Facts, ¶ 17, in its Complaint First Franklin alleged the Special Closing Instructions informed RTS of *Advantage's* closing requirements. (Compl., ¶ 21).

omitted)).[4]

On or about May 18, 2005, Judy Ann and Christopher Morgan entered into a mortgage loan in the principal amount of $167,000.00. (RTS's Facts, ¶ 19, citing Note and Deed of Trust[5], attached to Compl. as Exhs. 5 and 7, respectively).[6] Advantage contemporaneously assigned the Deed of Trust to First Franklin. (Id., ¶ 20, citing Assignment of Note, attached to Compl. as Exh. 6). According to First Franklin, the following transpired during the closing:

(a) The Morgans told those present at the Closing that the documents presented to them at the Closing were wrong in that they believed their monthly mortgage payments to be under $700.00 and that they would receive a little over $10,000 in cash from the refinancing;

(b) Specifically, the Morgans said that:
(i) The HUD-1 was inaccurate in that it indicated the wrong financing amount and amount for "cash to the borrower";
(ii) The Deed of Trust was inaccurate in that it indicated the wrong financing amount as identified on the HUD-1; and,
(iii) The LOAN DISBURSEMENT STATEMENT was inaccurate in that it indicated a higher monthly payment amount than promised in the refinancing.

(c) In response, the Morgans were told by either Julie A. Brown, Josh Pendergrass, "Zack," and/or "Pittala"[7] that they had just spoken to Advantage's owner, C. Sanchez, and that Mr. Sanchez assured the Morgans that their monthly mortgage payment would be promised amounts and not as stated in the closing documents;

---

[4] The Escrow Trust Disbursement Instructions, signed by the Morgans, specifically stated as follows: "It is expressly understood that RTS in no way represents the borrower(s). RTS is acting on behalf of the lender in the disbursement of mortgage loan proceeds." (RTS's Exh. 1).

[5] The Morgans' signatures on the Deed of Trust were notarized by Brown. (Compl., Exh. 7, P. 12).

[6] Again, while First Franklin admits the Morgans physically signed the documentation at issue, it disputes that they understood the documentation and the terms contained therein, and that the documentation and terms presented to the Morgans were the same as those submitted to First Franklin. (First Franklin's Response to RTS's Facts, ¶¶ 19, 30).

[7] According to First Franklin, Josh Pendergrass, "Zack," and "Pittala" were all Advantage representatives. (Compl., ¶ 37).

(d) The Morgans attempted to terminate the Closing and leave the office several times;

(e) Each time, those present at the Closing, including Julie A. Brown, Josh Pendergrass, "Zack," and/or "Pittala", persuaded the Morgans to stay and sign the documents they admitted were inaccurate and promised that the mortgage terms were as the Morgans believed;

(f) Julie A. Brown, Josh Pendergrass, "Zack," and/or "Pittala" assured the Morgans that if they executed the documents the mortgage terms would be as the Morgans believed, not as the documents indicated;

(g) Julie A. Brown acknowledged her presence at the Closing and disregarded the Morgans' objections to the inaccuracy of the written documents and, thereby, affirmatively:
  (i) certified that to the best of her knowledge, the HUD-1 Settlement Statement for which she prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction even though told by the Morgans that the HUD-1 was inaccurate;
  (ii) certified that the Morgans appeared before her and executed the DEED OF TRUST in which the Morgans accepted the terms they believed were inaccurate and notarized the Morgans' signatures as accepting the terms they believed to be inaccurate; and,
  (iii) acknowledged Christopher Morgan's acceptance of the loan terms on a LOAN DISBURSEMENT STATEMENT even though he did not accept the terms of the statement.

(Compl., ¶ 28). Despite the allegations in First Franklin's Complaint, it is now undisputed that Brown was not present at the closing, and never spoke to Judy Ann Morgan. (RTS's Facts, ¶ 27, and First Franklin's Response thereto). Brown notarized certain closing documents, however, representing that Christopher and/or Judy Ann Morgan personally appeared before her. (Id., ¶ 28 (citation omitted)). First Franklin then "table funded" the loan, meaning the loan was funded by a contemporaneous advance of the loan funds, and an assignment of the loan to the entity advancing the funds. (Id., ¶ 29 (citations omitted)). The documents submitted to First Franklin did not reflect the lower monthly mortgage amount, or the higher cash out value, as purportedly promised to the Morgans during the closing. (Compl., ¶ 29).

The Morgans did not make the first payment under the Note, nor did they make any subsequent payments.[8] (RTS's Facts, ¶ 21 (citation omitted)). On August 22, 2005, Christopher Morgan sent a letter to First Franklin Loan Services, alleging various acts of misconduct on the part of Advantage employees. (Id., ¶ 22, citing Morgan Letter, attached to Compl. as Exh. 9). Christopher Morgan never mentioned RTS or any of its employees in his letter. (Compl., Exh. 9). On October 16, 2005, Christopher Morgan filed for bankruptcy relief in the United States Bankruptcy Court for the Western District of Michigan. (RTS's Facts, ¶ 23).

On or about December 19, 2005, the Morgans abandoned the subject property, allowing it to fall into severe disrepair and fill with debris. (RTS's Facts, ¶ 24; Compl., ¶ 40). First Franklin eventually sold the property on April 24, 2007, for $76,400.00. (RTS's Facts, ¶ 25 (citation omitted)).

First Franklin filed its original Complaint in this matter on August 20, 2007. (Doc. No. 1). In its First Amended Complaint, filed January 11, 2008, First Franklin asserts both fraud and negligent misrepresentation on the part of RTS.[9] (Compl., ¶¶ 47-63). As stated above, RTS filed the instant Motion for Summary Judgment on April 9, 2009, asserting there are no material facts in dispute and RTS is entitled to judgment as a matter of law. (Doc. No. 45).

**SUMMARY JUDGMENT STANDARD**

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[8] According to First Franklin, the Morgans refused to render the payments due to the material misstatements made during the closing. (Compl., ¶ 37).

[9] Advantage originally was named as a Defendant in First Franklin's First Amended Complaint. (Compl., ¶ 2). After Advantage filed for bankruptcy, First Franklin voluntarily dismissed it as a Defendant without prejudice. (Doc. No. 30).

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Id. at 249.

## DISCUSSION

### I. Fraudulent And/Or Negligent Misrepresentation

As stated above, it is undisputed RTS's representative Brown was not present at the Morgan closing, and never spoke to Judy Ann Morgan. (RTS's Facts, ¶ 27 (citation omitted)). Brown's only affirmative misrepresentation, therefore, consisted of averring that she notarized certain closing documents in the presence of the Morgans, when in fact she did not. (See Compl., ¶ 34 ("Alternatively, if [RTS] was not physically present with the Morgans at the Closing and did not

observe or participate in persuading the Morgans to stay and execute the Closing documents they believed to be wrong, [RTS], through its employee Julie A. Brown, made certain material misrepresentations regarding the execution of the Closing documents and presence of Morgans with Julie A. Brown at [RTS's] office in St. Louis, Missouri.")).

Under Missouri law, the elements of fraud are: "(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) the speaker's intent that the representation should be acted upon by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of the falsity of the representation, (7) the hearer's reliance on the representation being true, (8) the hearer's right to rely thereon, (9) and the hearer's consequent and proximate injury." Toghiyany v. AmeriGas Propane, Inc., 309 F.3d 1088, 1092 (8th Cir. 2002) (internal quotations and citations omitted). To state a claim for negligent misrepresentation, First Franklin must allege facts that support the following elements: "(1) the speaker supplied information in the course of his business; (2) because of the speaker's failure to exercise reasonable care, the information was false; (3) the information was intentionally provided by the speaker for the guidance of limited persons in a particular business transaction; (4) the hearer justifiably relied on the information; and (5) due to the hearer's reliance on the information, the hearer suffered a pecuniary loss." Stein v. Novus Equities Co., 2009 WL 214342 at *3 (Mo. App. Jan. 27, 2009) (citation omitted); see also Richey v. Philipp, 259 S.W.3d 1, 8 (Mo. App. 2008) (citation omitted) ("[T]o make a submissible case for negligent misrepresentation, the plaintiff must show that he or she relied on a representation, which proximately caused the damages claimed."). "The failure to establish any element is fatal to the entire fraud claim." First Bank of Marietta v. Hogge, 161 F.3d 506, 511 (8th Cir. 1998) (citation omitted). "The same is true for negligent misrepresentation." Harris v. Smith, 250 S.W.3d 804, 809 (Mo. App. 2008) (citation omitted).

Upon consideration, the Court finds First Franklin's claims of fraudulent and/or negligent misrepresentation in connection with Brown's affirmative misstatement fail. Under Missouri law, "[f]or false representations to be actionable, there must exist a causal connection between the misrepresentation and the harm allegedly sustained." Hogge, 161 F.3d at 511 (internal quotations and citation omitted). "Once actual causation has been established, the issue becomes one of legal cause--also known as proximate cause--that is, whether the defendant should be held liable because the harm is the reasonable and probable consequence of the defendant's conduct." Richey, 259 S.W.3d at 8 (internal quotations and citations omitted). "Proximate cause requires something in addition to a 'but for' causation test because the 'but for' causation test serves only to exclude items that are not causal in fact; it will include items that are causal in fact but that would be unreasonable to base liability upon because they are too far removed from the ultimate injury or damage." Id. (citation omitted).

In the instant case, the Court finds there exists no causal relationship between RTS's misrepresentation and the damages sustained by First Franklin. Hogge, 161 F.3d at 511. Rather, First Franklin's loss resulted from the alleged misrepresentations made by Advantage to the Morgans during the closing itself, regarding both their monthly mortgage payment and the amount due back to the Morgans as borrowers. If RTS's representation had been true, i.e., if Brown had notarized the documents in the presence of the Morgans, the same loss would have been incurred. Id. First Franklin's loss thus was not caused by RTS's misrepresentation regarding Brown's presence at the signing of the closing documents, and so this portion of RTS's Motion for Summary Judgment must be granted. Id.[10]

---

[10] With respect to RTS's and Brown's actual duties as notary, the Court notes it is undisputed that both Christopher and Judy Ann Morgan signed every loan document. This fact removes RTS, as notary, from any responsibility for the execution of the documents and the harm that befell First

## II.     Fraudulent And/Or Negligent Omission

In its First Amended Complaint, First Franklin further claims RTS, "made *or allowed to be made* certain material misrepresentations regarding the Morgans' willingness, acceptance and ability to pay First Franklin's mortgage." (Compl., ¶ 49 (emphasis added)).  While the exact nature of this cause of action is unclear, First Franklin apparently attempts to hold RTS liable for fraudulent and/or negligent omission because, in its role as settlement and/or escrow agent, RTS allegedly had a duty to prevent Advantage and the Morgans from closing the loan under false pretenses.

To succeed on its claim, First Franklin must prove the traditional elements of a misrepresentation claim under Missouri law.  In re Ameriquest Mortg. Co. Mortg. Lending Practices Litigation, 2008 WL 1968794 at *3 (N.D. Ill. May 2, 2008) (applying Missouri law).

> Because silence or nondisclosure becomes misrepresentation only when there is a duty to speak, [Plaintiff] must show that [Defendant] had and violated such a duty.  A duty to speak may arise from a relationship of trust or confidence, an inequality of condition, or superior knowledge that is not reasonably available to the other party.

Id. (internal quotations and citations omitted).  The Court thus must consider whether RTS's roles as escrow and/or settlement agent for the transaction imposed such a duty.[11]

Under Missouri law, "an escrow agreement establishes a fiduciary relationship among the parties to the agreement."[12]  Gilmore v. Chicago Title Ins. Co., 926 S.W.2d 695, 699 (Mo. App.

---

Franklin, "because 'the notary's duty is [merely] to acknowledge the authenticity of the signature.'" Dickey v. Royal Banks of Missouri, 111 F.3d 580, 584 (8th Cir. 1997), quoting Herrero v. Cummins Mid-America, Inc., 930 S.W.2d 18, 22 (Mo. App. 1996).  "Not surprisingly, [Plaintiff] offers no case in which a notary was held liable in a situation where the notarization was technically deficient but the signature was authentic."  Id.

[11] It is undisputed that RTS's role as notary did not impose a duty to speak.  See Dickey, 111 F.3d at 584 (rejecting the claim that the role of the notary was to make sure the signatory knew what he or she was signing).

[12] The Court assumes without deciding that the Special Closing Instructions imposed the same duties on RTS as would an escrow agreement.

- 10 -

1996).

> The fiduciary relationship of an escrow agent and the other parties to the agreement is much narrower in scope than other fiduciary relationships such as attorney/client. An escrow agent is bound by the terms of the escrow agreement and breaches the fiduciary duty only when the agent fails to follow those terms. It is not the escrow agent's duty to discover fraud committed by one party upon another or to protect the parties from each other except as to the limited duties outlined by the agreement.

Id. (citation omitted). Thus, in order to establish fraudulent or negligent omission on the part of RTS, First Franklin must prove RTS failed to comply with the terms of either the Special Closing Instructions or the Escrow Trust Disbursement Instructions. Hammack v. Coffelt Land Title, Inc., 2009 WL 674339 at *2 (Mo. App. Mar. 17, 2009).[13]

Upon consideration, the Court finds First Franklin fails to set forth facts tending to demonstrate RTS violated the terms of either agreement. In re Ameriquest, 2008 WL 1968794 at *2. Rather, the Court finds it was Advantage, as broker and agent, that was obligated to originate appropriate loans for First Franklin. By way of contrast, RTS agreed only to carry out the specific responsibilities outlined in the Special Closing Instructions and Escrow Trust Disbursement Instructions, including making sure there existed no additional subordinate financing, obtaining all deeds and releases necessary to clear title, making sure all documents were executed by the borrowers exactly as prepared by Advantage, making sure the title policy was in the right amount, transmitting certain documents to Advantage after signing, and making disbursements for the transaction pursuant to the HUD-1 Settlement Statement.[14] (Special Closing Instructions and Escrow Trust Disbursement

---

[13] To the extent Charles v. Florida Foreclosure Placement Center, LLC, 988 So.2d 1157 (Fl. App. 2008), cited by First Franklin in its response, may have imposed different obligations on RTS under Florida law, the Court notes it is not binding precedent and will not be followed in this case.

[14] Despite First Franklin's representative's protestations to the contrary, the Special Closing Instructions and Escrow Trust Disbursement Instructions did not impose on RTS the duty to answer the Morgans' questions and explain the terms of the loan documents to them, the duty to inform the

Instructions, RTS's Exhs. 6 and 1, respectively). First Franklin has not alleged, let alone proven, that RTS failed in those regards. In re Ameriquest, 2008 WL 1968794 at *2. Id. RTS's Motion for Summary Judgment must therefore be granted.[15]

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Residential Title Services, Inc.'s Motion for Summary Judgment (Doc. No. 45) is **GRANTED**, and First Franklin's claims against RTS are **DISMISSED** with prejudice.

Dated this 28th day of May, 2009.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE

---

Morgans of inconsistencies between representations made at the closing and the documents being signed, or the duty to ensure that the loan documents accurately reflected the Morgans' subjective beliefs.

[15] In light of above rulings, the Court need not address RTS's assertion that First Franklin's damages were caused by the intentional destruction and abandonment of the subject property.